IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

STEVEN CHARLES FORBESS,

        Petitioner,

    v.

DON MILLS, Superintendent,
Two Rivers Correctional Institution,

        Respondent.

Civil No. 3:08-cv-01261-AC

FINDINGS AND RECOMMENDATION

      TODD H. GROVER
      333 SW Wilson Avenue
      Suite 204
      Bend, OR  97702

        Attorney for Petitioner

      ELLEN F. ROSENBLUM
      Attorney General
      ANDREW D. HALLMAN
      Assistant Attorney General
      Department of Justice
      1162 Court Street NE
      Salem, OR  97301

        Attorneys for Respondent

1 - FINDINGS AND RECOMMENDATION -

ACOSTA, Magistrate Judge.

Petitioner, an inmate at the Two Rivers Correctional Institution, brings this habeas corpus action pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, the Petition for Writ of Habeas Corpus (#3) should be DENIED as untimely.

## BACKGROUND

I.    **Procedural History**

Petitioner is in the custody of the Oregon Department of Corrections pursuant to a Corrected Judgment of Conviction/Sentence dated November 1, 2000, *nunc pro tunc* July 30, 1999, after a jury found him guilty of Kidnapping the First Degree, Attempted Murder, Assault in the Second Degree (two counts), Attempted Assault in the Second Degree,  Assault in the Third Degree, Tampering with a Witness, and Coercion.  Assisted by counsel, Petitioner filed a direct appeal.  The Oregon Court of Appeals granted the state's motion for summary affirmance.  Resp. Exh. 106. Petitioner did not seek review from the Oregon Supreme Court.  The appellate judgment issued on November 28, 2001. *Id.*

Petitioner did not become aware his direct appeal was final until April 2002.  In his Affidavit, Petitioner describes how he learned of the Oregon Court of Appeals' decision:

> Another problem I had with the time delay, was the amount of time I had to even study the law and weigh my options.  My direct appeal attorney Ms. Jennelle Hall, waited for over 6 months to even let me know that my appeal had been denied and even send me a copy of the appellant brief.  I was called down to the property room at O.S.P. in April of 2002, to pick up some property.  What was there, was the appellant brief, all the trial transcripts and a letter dated 9/28/01, that said the Court of Appeals had affirmed my convictions.

Pet. Exh. 8, p. 4.  Petitioner described his reaction to discovering the information as follows:

> I was very upset by this extremely late notice. I wrote Ms. Hall a letter and asked
> for an explanation. She wrote me a letter dated 5/2/02. It said, I'm too puzzled by
> the brief you recently received, that she doesn't know why it took so long for the
> brief to be delivered to me. This did not help me much.

*Id.*

Before he learned his direct appeal was final, on February 2, 2002, Petitioner filed a state

petition for writ of habeas corpus. Petitioner did not, however, challenge his conviction or

sentence. Instead, he complained of the conditions of his confinement, specifically that he was

being denied medical care.

Petitioner did not take any further steps to challenge his conviction until July 14, 2003,

when he filed another state petition for writ of habeas corpus. Petitioner again alleged a conditions

of confinement claim, but this time also included a claim that his convictions were illegally

obtained. On July 22, 2003, the Marion County Circuit Court dismissed the state habeas corpus

action.

On October 30, 2003, Petitioner filed a petition for state post-conviction relief ("PCR") in

Marion County Circuit Court. Following an evidentiary hearing, the PCR trial judge denied relief.

On appeal, the Oregon Court of Appeals affirmed without opinion and the Oregon Supreme Court

denied review. *Forbess v. Belleque*, 218 Or. App. 735, 180 P.3d 763, *rev. denied*, 345 Or. 301, 194

P.3d 147 (2008). The appellate judgment in Petitioner's PCR action issued on October 22, 2008.

Also on October 22, 2008, Petitioner signed his Petition for Writ of Habeas Corpus pursuant

to 28 U.S.C. § 2254, which was filed in this Court on October 24, 2008. Petitioner alleges claims

of ineffective assistance of trial and appellate counsel, newly discovered exculpatory evidence, and

*Brady* violations. This Court issued an order requiring Petitioner to show cause why his Petition

should not be summarily dismissed as untimely. In response, Petitioner conceded that the Petition is untimely, but argued the limitation period should be equitably tolled because his mental illness prevented him from timely filing. The Court withdrew the order to show cause and ordered the Petition served on the Respondent. Respondent objects to the application of equitable tolling, and argues the Petition should be dismissed as untimely.

Petitioner requested an evidentiary hearing on the equitable tolling issue. On March 1, 2012, this Court issued an Opinion and Order granting Petitioner's request. An evidentiary hearing was scheduled for July 20, 2012. The parties submitted supplemental exhibits and briefs in anticipation of the evidentiary hearing. Both parties subsequently indicated their intent to rely upon the documentary evidence and elected not to present any live testimony. On July 20, 2012, the Court held oral argument on the equitable tolling issue.

## II.    Petitioner's Mental Health History

Five different mental health professionals evaluated Petitioner between 1999 and 2002.[1] In February 1999, James E. McDonald, Ph.D, P.C. ("Dr. McDonald") evaluated Petitioner and concluded Petitioner did not have a mental impairment that prevented him from understanding the charges against him or from participating in his own defense. Pet. Exh. 2, p. 4. Dr. McDonald noted in his written report, however, that Petitioner appeared to suffer from "a Delusional disorder

---

[1]As discussed below, the relevant time period for the purposes of evaluating Petitioner's equitable tolling claim runs from November 28, 2001, through October 30, 2003, when Petitioner filed his state PCR petition. Although Petitioner presented evidence of additional mental evaluations after October 30, 2003, that evidence is not pertinent to Petitioner's claims.

with elaborate paranoid and grandiose themes," and that Petitioner "is adamant in his assertions that his fears and beliefs are rational and not fabricated." *Id.*

In July 1999, S. Michael Sasser, M.D. ("Dr. Sasser") evaluated Petitioner to determine whether trial court should sentence Petitioner under Oregon's "dangerous offender" statute. Dr. Sasser issued a psychiatric evaluation report which concluded Petitioner suffered from a severe personality disorder. Pet. Exh. 3, p. 1. Nowhere in the report does Dr. Sasser reference delusions. Dr. Sasser did not, however, personally interview Petitioner, and according to the "Referral Question" identified in his report, the scope of his inquiry was limited to whether or not Petitioner suffered from a personality disorder. *Id.*

In April 2000, Ralph Ihle, Ph.D. ("Dr. Ihle") of the U.S. Department of Justice evaluated Petitioner to determine whether he was competent to stand trial on federal charges. Dr. Ihle issued a forensic evaluation concluding that Petitioner was competent to understand the nature of the proceedings against him and to assist in his defense. Pet. Exh. 4, p. 6. Dr. Ihle diagnosed Petitioner with alcohol abuse in remission, cannabis abuse in remission, and antisocial personality disorder which often leads to "deception, manipulation, drug abuse, explosive or impulsive behavior, and opportunistic behavior." *Id.* at pp. 7-8. Further, he noted that there "was no evidence of current delusions, loose associations, confusion, or confabulations." *Id.* at p. 5.

In December 2000, Sharon Kay Melnick, M.D. ("Dr. Melnick") evaluated Petitioner at the request of Petitioner's court-appointed counsel in the federal criminal case. In the most extensive and detailed report concerning Petitioner's mental state, Dr. Melnick found the evidence she reviewed supported a conclusion that "Petitioner is mentally ill and is best diagnosed as someone

with a **Delusional Disorder**." Pet. Exh. 5, p. 9 (emphasis in original). Dr. Melnick catalogued Petitioner's history of delusions that his ex-wife and her family are Mafia figures, that they refrained from killing him only because he married into the family, that he is working, or has worked as an informant for the FBI, and that he is subject to constant assassination attempts, which included people tunneling underneath and into his home.

Dr. Melnick opined that Petitioner will not admit and does not understand that reality is not as he perceives it. *Id.* Dr. Melnick further noted that Petitioner often refuses to tell psychiatrists about his delusions, but that in interviews with non-psychiatrists, he has admitted his belief that he is in the witness protection program and that the FBI would arrange for his release when the "time is right." *Id.* at p. 8.

Finally, in February 2002, Marvin D. Fickle, M.D. ("Dr. Fickle") issued a psychiatric evaluation following Petitioner's involuntary admission to the psychiatric unit at the Oregon State Penitentiary. Dr. Fickle diagnosed Petitioner as suffering from a psychotic disorder based on Petitioner's increasing paranoia regarding his belief that those around him, including correctional officers, were trying to kill him. Pet. Exh. 6, pp. 1, 3. Dr. Fickle prescribed an anti-psychotic medication and noted that Petitioner's perception of reality was "impaired." *Id.* at p. 3.

In addition to the evaluations discussed above, Petitioner presented evidence in the form of mental health records kept by the Oregon Department of Corrections ("ODOC") during the relevant time period. While too extensive to reiterate in detail here, the records concerning Petitioner's mental health management repeatedly refer to Petitioner's diagnosis as suffering from

6 - FINDINGS AND RECOMMENDATION -

a Psychotic Disorder. *See, e.g.*, Pet. Exh. 7, pp. 22, 24, 32, 37. Mental Health Progress Notes refer

repeatedly to Petitioner's delusional beliefs. *See, e.g.*, Pet. Exh. 7, pp. 26, 27, 28.

## LEGAL STANDARDS

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") imposes a one-year statute

of limitations for filing a petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C.

§ 2244. The limitations period begins to run on the date the conviction becomes final, *i.e.*, the

completion of the direct appeal process. 28 U.S.C. § 2244(d)(1).

The limitations period is subject to statutory tolling during the pendency of properly filed

state post-conviction or other collateral state proceedings. 28 U.S.C. § 2244(d)(2). The limitations

period may also be equitable tolled in appropriate circumstances. *Holland v. Florida*, 130 S. Ct.

2549, 2554 (2010).

A habeas petitioner "is 'entitled to equitable tolling' only if he shows '(1) that he has been

pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way' and

prevented timely filing." *Holland*, 130 S. Ct. at 2562 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408,

418 (2005)). The determination whether equitable tolling should apply is fact-dependent and

should be made on a case-by-case basis. *Bills v. Clark*, 628 F.3d 1092, 1097 (9th Cir. 2010). The

threshold upon which a petitioner may obtain equitable tolling is very high, "lest the exceptions

swallow the rule." *Id*. at 1097, (citing *Miranda v. Castro*, 292 F.3d 1063, 1066 (9th Cir. 2002)).

"A petitioner seeking equitable tolling bears the burden of showing both that there were

extraordinary circumstances, and that the extraordinary circumstances were the *cause* of his

untimeliness." *Roberts v. Marshall*, 627 F.3d 768, 772 (9th Cir. 2010) (internal quotation marks omitted, emphasis in original), *cert. denied*, 132 S. Ct. 286 (2011).

Mental illness can constitute an "extraordinary circumstance" entitling a petitioner to equitable tolling. *Laws v. Lamarque*, 351 F.3d 919, 922-23 (9th Cir. 2003). The Ninth Circuit has articulated a two-part test a petitioner must meet to show that a mental impairment qualifies him for equitable tolling of the limitations period:

> (1) First, a petitioner must show his mental impairment was an "extraordinary circumstance" beyond his control, *see Holland*, 130 S. Ct. at 2562, by demonstrating the impairment was so severe that either
>
>> (a) petitioner was unable rationally or factually to personally understand the need to timely file, or
>>
>> (b) petitioner's mental state rendered him unable personally to prepare a habeas petition and effectuate its filing. [Footnote omitted]
>
> (2) Second, the petitioner must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance. *See id.*

*Bills*, 628 F.3d at 1100.

In general, the level of mental impairment necessary to justify equitable tolling is limited to cases of "profound mental incapacity." *United States v. Sosa*, 364 F.3d 507, 513 (4th Cir. 2004); *see also Grant v. McDonnell Douglas Corp.*, 163 F.3d 1136, 1138 (9th Cir. 1998) (finding equitable tolling for a mental condition appropriate "only in exceptional circumstances, such as institutionalization or adjudged mental incompetence"). For example, the Ninth Circuit found equitable tolling appropriate in a case where the prisoner had "serious mental problems for many years," and suffered from a psychotic disorder accompanied by delusions, hallucinations,

inappropriate affect, social withdrawal, bizarreness, fragmentation of thinking, and incoherence. *Calderon v. U.S. Dist. Ct. for Centr. Dist. of Cal. (Kelly V)*, 163 F.3d 530, 541-42 (9th Cir. 1998) (en banc), *overruled on other grnds by Woodford v. Garceau*, 538 U.S. 202 (2003); *see also Calderon v. U.S. Dist. Ct. for Centr. Dist. of Cal. (Kelly III)*, 127 F.3d 782, 788 n. 1 (9th Cir. 1997) (Tashima, J., dissenting) (describing Kelly's mental illness).  In the *Kelly* case, several prison psychiatrists evaluated Kelly, and none of them could ascertain that he was sane. *Kelly III*, 127 F.3d at 788 n. 1.

With respect to the necessary diligence, "the petitioner must diligently seek assistance and exploit whatever assistance is reasonably available." *Bills*, 628 F.3d at 1101.  A petitioner may satisfy the diligence prong if "the petitioner's mental impairment prevented him from locating assistance or communicating with or sufficiently supervising any assistance actually found." *Id*. Stated otherwise, "the due diligence prong of the *Bills* test requires a petitioner whose mental impairment is so severe that he is unable understand the need to timely file or to file a petition on his own to demonstrate that due to his mental impairment, he also lacked 'the ability to understand the need for assistance, the ability to secure it, or the ability to cooperate with or monitor assistance the petitioner does secure ... [t]he petitioner therefore always remains accountable for diligence in pursuing his or her rights.'" *James v. Harrington*, 2011 WL 3585941, *20 (C.D. Cal., Mar. 9, 2011) (quoting *Bills*, 628 F.3d at 1100).  The court must review "the totality of the circumstances" to determine if the mental impairment was the "but-for cause of any delay." *Bills*, 628 F.3d at 1100.

## DISCUSSION

The appellate judgment in Petitioner's direct appeal issued on November 28, 2001. As such, the federal limitation period to file a Petition for Writ of Habeas Corpus expired on November 29, 2002. Petitioner filed his state PCR petition on October 30, 2003. Because the PCR proceeding statutorily tolled the limitations period, and because Petitioner signed his Petition for Writ of Habeas Corpus on October 22, 2008, the same date appellate judgment issued in the PCR proceeding, this Court must find that from November 29, 2002, until October 30, 2003, Petitioner was sufficiently mentally impaired and that his mental impairment was the but-for cause of his failure to file a federal habeas petition.

### I.    Level of Mental Impairment

Petitioner claims that in the relevant period between the final judgment of conviction and his filing of a state PCR petition he suffered from delusions that rendered him incapable of understanding the necessity of filing in a timely manner. As noted, for the court to find that a mental impairment constitutes an "extraordinary circumstance," the impairment must be so severe that either "(a) petitioner was unable rationally or factually to personally understand the need to timely file, or (b) petitioner's mental state rendered unable to personally prepare a habeas petition . . . ." *Id.*

Here, Petitioner presented sufficient evidence to establish he was unable to rationally or factually understand the necessity of filing a timely habeas corpus petitioner. Petitioner believed he was working undercover for the FBI, and his trial was a "sham" orchestrated to lure his ex-wife out of hiding and arrest her for being part of an extensive drug distribution operation. Petitioner's

claim that his delusions persisted from the time of his trial to the expiration of the limitations period is supported by the psychological evaluations of Dr. Fickle, Dr. McDonald, and Dr. Melnick, and by the mental health records. During the relevant time period, Petitioner genuinely believed the FBI would release him once they arrested his ex-wife. As such, he was incapable of rationally understanding the necessity of filing a timely habeas petition.

Respondent argues Petitioner does not satisfy the *Bills* test because he rationally and factually understood the need to timely file, but intentionally delayed because of "some greater, irrational need." Respondent claims there is no exception in *Bills* for a petitioner whose intentional delay was irrational and the product of delusions. The Court disagrees. Under *Bills*, the court is to find the presence of "extraordinary circumstances" when the petitioner "was unable to *rationally* . . . understand the need to timely file." *Bills*, 628 F.3d at 1100 (emphasis added). This standard undoubtably allows the court to apply equitable tolling for intentional delays which resulted directly from irrationally held beliefs.

## II.    Diligence

In order to establish the "diligence" prong of the *Bills* test, petitioner bears the burden of proving that his delusions were the but-for cause of the late filing of his petitioner. Petitioner fails to carry this burden. It is equally or more probable that Petitioner's late filing was caused by (1) failing to receive timely notice of the termination of his direct appeal; (2) not being advised by his appellate counsel of the one-year federal limitation period; and (3) then not understanding the state habeas/PCR system.

In his affidavit, Petitioner expresses his anger about not receiving timely notice that his appeal was final. As he states "[a]nother problem I had with the time delay, was the amount of time I had to even study the law and weigh my options" because he did not become aware his appeal had been denied until some six months had passed. Pet. Second Supp. Exh. 8, p. 4. Petitioner also expresses his dismay over appellate counsel's failure to advise him of the federal limitation period:

> I wrote Ms. Hall a letter asked [sic] for an explanation [of why it took so long for him to receive notice]. She wrote me a letter dated 5/2/02. It said, I'm too puzzled by the brief you recently received, that she doesn't know why it took so long for the brief to be delivered to me. This did not help me much. Ms. Hall doesn't mention anything about time limits other than I have 2 years to file a State Post-Conviction Relief. . . . One of my claims in my petition is denial of effective assistance in appellate counsel. . . . It would only be fair to excuse this time that was stolen from me, over this issue of timelyness [sic].

*Id.*

Also, Petitioner availed himself of the assistance of a fellow inmate to file a state habeas petition within the time the federal habeas limitation period was running. The fact that the state habeas petition concerned a medical condition does not alter the fact that Petitioner understood the need for assistance and the ability to secure it. In his Affidavit, he describes what occurred in connection with his state court filings as follows:

> Respondent claims that I prepared and filed a State habeas corpus relief on January 16, 2002, before the expiration of the statute of limitations. This was a medical issue and no time limits were even considered in that decision. . . .
>
> I did not know the legal requirements of what was needed to prevail on my claims. Therefore, my petition was dismissed. It never made it to Court because I did not know what I was doing. Then went to an inmate legal assistant and asked for help on my medical issues. Inmates were the only thing available for me at that time for any kind of legal advise [sic]. This legal assistant prepared a second State Habeas Corpus for me over my medical issues. I did not feel comfortable in talking with an inmate about my criminal case because of my involvement with law enforcement

and I was acutely aware that the mafia had a major contract out on my life. . . . The second State Habeas Corpus that I filed was prepared by an inmate legal assistant. This was immediately dismissed for failure to state a claim. Now becoming familiar with the process, I went to work preparing a third State Habeas Corpus. I included issues of my criminal case and claimed I was being held unlawfully. The Court dismissed this State habeas also. I then began work on a post conviction relief and a 4th State habeas. Because of all the pain I was in and the mental stress this caused me, it took me about 4 months to figure out how to complete and file a post-conviction relief.

Pet. Second Supp. Exh. 8, p. 2.

Finally, Petitioner discusses his confusion about the state post-conviction process and his attempts to avail himself of the remedy:

I really hoped that the government was investagating [sic]. My life depended on these gangsters getting caught. I did want to give the government some time to do their job, but at the same time, I also wanted to know my legal rights. My options were limited.

I did write Mr. Ron Cox and I asked for legal advice. He never answered my letter. I wrote other various agencies looking for legal advice. The A.C.L.U. said they couldn't help me. The Western Prison Project said the[y] couldn't help. I learned that Oregon is the only State that does not have an Innocence Project.

No one was providing me with any information to the status of any kind of investigation. I felt abandoned and betrayed. I knew any post-conviction would be public record for anyone that wanted to access those records. I was afraid and overwhelmed, and very confused as to what to do. I needed medical care. So I filed a State habeas corpus on both issues, medical and criminal. The Court dismissed this and said I must file a Post-Conviction. I didn't know what I was doing, it was a desperate plea for help.

Then I filed a post-conviction as fast as I could.

Pet. Second Supp. Exh. 7, p. 5.

Under the totality of these circumstances, Petitioner failed to sustain his burden of proving that his mental impairment was the but-for cause of the late filing of his Petition, because the delay

was as likely or more likely caused by his failure to understand the correct procedural posture of his case and the correct avenues for relief, none of which are grounds for equitable tolling under the *Bills* standard. Accordingly, the Petition for Writ of Habeas Corpus should be dismissed as untimely.

## RECOMMENDATION

For these reasons, the Petition for Writ of Habeas Corpus (#3) should be DENIED as untimely and judgment of dismissal should be entered. Because Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability should be DENIED. *See* 28 U.S.C. § 2253(c)(2).

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due August 31, 2012. If no objections are filed, review of the Findings and Recommendation will go under advisement that date.

A party may respond to another party's objections within 14 days after the objections are filed. If objections are filed, review of the Findings and Recommendation will go under advisement upon receipt of the response, or on the latest date for filing a response.

DATED this 17th day of August, 2012.

John V. Acosta
United States Magistrate Judge

14 - FINDINGS AND RECOMMENDATION